JOSHUA HOWARD,

                Plaintiff,

v.                                        Case No. 21-cv-273-pp

CAPT. BAUMANN,

                Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 51) AND DISMISSING CASE

Plaintiff Joshua Howard, who is incarcerated at Fox Lake Correctional Institution and is representing himself, filed this case alleging violations of his constitutional rights when he was incarcerated at Green Bay Correctional Institution. Dkt. No. 1. The court screened the amended complaint (Dkt. No. 14) and allowed the plaintiff to proceed on a retaliation claim against Captain Baumann and Lieutenant Kettenhoven based on allegations that they interrogated the plaintiff for something they knew he did not do, then placed him in temporary lock-up status (TLU) without legitimate cause in retaliation for the plaintiff filing an administrative complaint against Baumann. Dkt. No. 15 at 9-10. The court subsequently granted the plaintiff's request to dismiss defendant Kettenhoven. Dkt. No. 73. The remaining defendant, Captain Baumann, has filed a motion for summary judgment. Dkt. No. 51. This order grants the defendant's motion and dismisses the case.

1

## I. Facts[1]

The plaintiff was incarcerated at Green Bay Correctional Institution during the events described in the complaint. Dkt. No. 53 at ¶1. The defendant worked as a captain at Green Bay during that time. Id. at ¶2.

### A. Power of Attorney and Plaintiff's Inmate Complaint

When the plaintiff arrived at Green Bay in October 2017, he ordered a financial power of attorney (POA) form so that he could delegate some financial decisions to a relative. Dkt. No. 83 at ¶1. He filled out the form and submitted a request slip to see the notary. Id. The notary, Alan DeGroot, told the plaintiff that the POA form had to be approved by security before it could be notarized. Id. at ¶2. DeGroot instructed the plaintiff to send the form to defendant Baumann and to put in another request to see DeGroot after it was approved. Id. The plaintiff sent the form to the defendant in November 2017. Id. at ¶3. He waited a week or two and when he didn't hear back, he sent a request slip asking the defendant to review the POA. Id. The plaintiff waited another two weeks and wrote to the defendant, but still did not hear anything from him. Id.

As a captain, one of the defendant's jobs was to review and approve an incarcerated individual's request for a POA. Dkt. No. 53 at ¶11. A POA document can be denied for several reasons, including that the form is not filled out completely, that the form does not specify exactly what it will be used for and that the reason for submitting a POA request creates a security concern

---

[1] The court includes only material, properly supported facts in this section. See Fed. R. Civ. P. 56(c).

for the institution. Id. at ¶13. An incarcerated individual designating a POA can be considered a security concern in the institution setting so a security staff member reviews and either approves or denies the POA document. Id. at ¶14. If an individual submits a POA for financial, the person designated as the POA may be able to circumvent the normal daily operations of the institution's business office. Id. at ¶15. The concern is that setting up a POA for financial would allow the POA designee to obtain any settlements or large deposits and deposit them into a private account, effectively bypassing the business office. Id. at ¶16. This could result in money received by an incarcerated individual not being used to pay institution debts. Id. at ¶17.

On February 2, 2018, the plaintiff submitted complaint GBCI-2018-2998 in which he alleged that the defendant had not responded to his request for a POA. Dkt. No. 53 at ¶19; Dkt. No. 83 at ¶5. At some point between February 2 and February 12, 2018, DeGroot (who in addition to being a complaint examiner also is a notary) contacted the defendant to see if he had received a request for a POA. Dkt. No. 53 at ¶21. The defendant told DeGroot that he did not believe he had received a POA request from the plaintiff and that he would have responded had he received one. Id. at ¶22. During this same time frame, or shortly thereafter, the defendant received a POA document from the plaintiff, and he responded with a February 12, 2018 memo notifying the plaintiff of deficiencies with the document. Id. at ¶23. The defendant's memo said that the form was incomplete because the plaintiff did not sign it and did not delegate any specific actions that he would like the POA to have. Id. at ¶24. This would

3

be a security concern for the institution and warranted the return of the plaintiff's POA request.[2] Id.

      B.    <u>Investigation, Interview and Placement in TLU</u>

Green Bay's business office keeps records of incarcerated persons' trust accounts and the court fees, victim restitution (if there is any), child support or institution restitution each person owes. Dkt. No. 53 at ¶5. A certain percentage of money deposited for an incarcerated individual is set aside to pay debts such as the court fees, restitution and child support. Id. at ¶6. In February 2018, prison security staff began investigating concerns reported by the business office that large and unusual sums of money were being exchanged between incarcerated persons' bank accounts. Id. at ¶7. The unusual money transfers were suspected to be unauthorized transfers of money for purposes of paying off debts and paying for contraband, such as drugs and/or gambling. Id. at ¶8. One of the bank accounts involved belonged to the plaintiff. Id. at ¶9.

On February 2, 2018, the Wisconsin Department of Corrections' (DOC) central office informed the Green Bay business office that the plaintiff had won

---

[2] The plaintiff disagrees that his POA form was deficient. He says it clearly shows that he wanted his agent to have the authority to take actions regarding taxes and personal and family maintenance. He also says that he hadn't signed it yet because it needed to be notarized. Dkt. No. 82 at ¶24.

The plaintiff's POA form shows that he checked boxes for "Personal and family maintenance" and "Taxes" to indicate that he granted his agent general authority to act on his behalf regarding those subjects. Dkt. No. 81-1 at 2. The instructions for the POA form say that the document does not have to be signed in the presence of a notary, but that it can be. Id. at 1.

4

a Dane County Circuit Court lawsuit (Case No. 16CV3251) in which the court had ordered that institutions could no longer withhold fifty percent of funds deposited into incarcerated persons' accounts toward restitution. Dkt. No. 53 at ¶10. The amount allowed to be withheld had been reduced to twenty-five percent. Id.

On February 9, 2018, security staff received from an incarcerated individual anonymous correspondence that included threats to the safety of the institution, staff and other incarcerated persons. Dkt. No. 53 at ¶25. The two anonymous notes were received in the security mailbox and warned of a prison riot to take place at Green Bay in the upcoming week. Id. at ¶26. Both notes stated that incarcerated individuals were upset about money not reaching their accounts. Id. The notes, which are partially redacted, state in part:

> Some guys are going to jump the guards on 2/19/18, they say they are losing there [sic] money order [redacted].
>
> There's going to be a big riot the week of 2/19/18 because excess is taking all our money. They are going to beat the CO's [redacted].

Dkt. No. 83 at ¶27.

The defendant's job included ascertaining the validity of the threats. Dkt. No. 53 at ¶27. The threats appeared to be the result of a recent change in how incarcerated individuals' restitution debt is collected from accounts.[3] Id. The defendant contacted Green Bay's business office and spoke with Mark Eiting,

---

[3] The plaintiff states that there is nothing in the wording of the unredacted portion of the threats that would support the defendant's belief that this was related to the collection rate for restitution, which he says had been in effect for nearly two years. Dkt. No. 82 at ¶27.

financial programs supervisor, to determine whether anyone had complained prior to February 9, 2018 about the recent change in how money was to be removed from accounts or whether any incarcerated person was participating in unauthorized transfers of large amounts of money. Id. at ¶28. Eiting notified the defendant that the plaintiff recently had filed a lawsuit against the DOC related to the restitution system and had won. Id. at ¶29. The plaintiff also had received a large amount of money in his account, which caused question for review by the business office.[4] Id.

Based on the information from Eiting, the defendant tried to determine if the plaintiff had written the anonymous notes. Dkt. No. 53 at ¶30. The defendant was not able to definitively state that the plaintiff had written the correspondence but observed some similarities between what was anonymously submitted and the plaintiff's known handwriting samples. Id.

On February 9, 2018, the defendant pulled the plaintiff in for an initial interview during which he asked him about his involvement in the anonymous notes. Dkt. No. 53 at ¶31. At that time, the defendant's involvement was limited to information gathering. Id. The defendant asked Kettenhoven (former defendant) to sit in and observe the interview. Id. ¶32. The parties dispute what was said during the interview.

According to the defendant, the plaintiff would not respond to any questions during the interview. Dkt. No. 53 at ¶35. The plaintiff seemed evasive

---

[4] The plaintiff states that prior to being placed in TLU February 2018, he had not received money since late November 2017. Dkt. No. 82 at ¶29.

6

and confrontational, and flipped the questions back on the defendant and Kettenhoven, asking what they knew. Id. Based on his training and experience in security and investigations, the defendant was led to believe that the plaintiff may have been participating in unauthorized transfers of large amounts of money. Id. at ¶36. Based on the limited information the defendant had from the interview with the plaintiff, the defendant felt it necessary to place the plaintiff in TLU while security staff evaluated the situation further. Id. at ¶37.

According to the plaintiff, he answered the defendant's questions during the interview, but he knew nothing, so he was unable to provide information. Dkt. No. 82 at ¶35. The plaintiff states that the defendant started asking him about putting in the mailbox unsigned request slips complaining about money not making it into incarcerated individuals' accounts. Dkt. No. 83 at ¶7. The plaintiff replied that he had never heard of money being sent in and not making it into an account and that he had never put anonymous notes in the mailbox. Id. The plaintiff commented that as they (the defendant and Kettenhoven) should be aware, if he had an issue, he did not have a problem filing a complaint. Id. at ¶8. The plaintiff states that the defendant immediately snapped that he was locking the plaintiff up. Id. According to the plaintiff, the entire episode lasted about ninety seconds, and the plaintiff was escorted into the hallway where he was searched and handcuffed. Id. at ¶9. He says that after he was handcuffed, the defendant "leaned in on the plaintiff's left side and said, by the way, you can consider this my denial of your POA." Id.

7

The defendant ordered Kettenhoven to place the plaintiff into TLU status pending investigation. Dkt. No. 53 at ¶38. The defendant states that he placed the plaintiff in TLU status to "freeze the situation" to prevent destruction of evidence, unauthorized transfers of money and the intimidation of witnesses due to the uncertainty of whether the plaintiff was involved in the ongoing situation. Id. at ¶39. The plaintiff was escorted to cell 205, an observation cell for incarcerated individuals on suicide watch. Dkt. No. 83 at ¶11. He was told that all the other cells were full. Id. The toilet was backed up and it was filled with tissue, feces and urine. Id. The plaintiff was assigned to cell 205 at 2:48 p.m. Id. at ¶12. Maintenance was called to the cell a couple times earlier in the day. Id. Other cells were available. Id. The plaintiff complained to the sergeant and officers about the condition of the cell. Id. at ¶13. He was moved to another cell after 7:00 p.m. on February 9, 2018. Id.

That night at 11:00 p.m., Captain Cushing emailed Sergeant Bebo, asking him to listen to the phone call recordings for the plaintiff and Angel Michael, another incarcerated individual, for anything about "a disturbance or lock down or staff assault, loading up on canteen, etc." Dkt. No. 83 at ¶15. Cushing copied the defendant on the email and asked Bebo to reply to all if he found anything substantial. Id. A few hours later, at 4:45 a.m. on February 10, 2018, Bebo informed Cushing via email that there were no calls made by Angel Michael but that he had reviewed thirty-four calls made by the plaintiff to his family and that there were no references made about disruptions, attacks or loading up on canteen. Id. at ¶16. Bebo also reported that the plaintiff had

8

used the pin numbers of two other incarcerated individuals to make calls. Id. The defendant was copied on this email. Id.

The defendant interviewed other incarcerated individuals about the investigation but he does not recall their names. Dkt. No. 53 at ¶40. The defendant shared with other supervisors the information provided to him as a result of these interviews while they tried to determine the scope of the incident and whether a formal investigation needed to be completed. Id. at ¶41. Over the next few weeks, security staff reviewed phone calls made by the plaintiff and other incarcerated individuals to determine whether they potentially were involved in the situation. Id. at ¶42.

As a result of the review of the plaintiff's phone calls, it was determined that he was violating DOC 303.34, unauthorized forms of communications, for using other incarcerated individuals' PINs to make phone calls. Dkt. No. 53 at ¶43. As a result of those policy violations, the plaintiff received a conduct report. Id. The defendant ordered the staff member who reviewed the phone calls to issue a conduct report because the plaintiff was circumventing security procedures and utilizing other incarcerated individuals' PINs to make phone calls outside the institution. Id. at ¶44.

On February 14, 2018, the defendant received an email informing him that an officer completing TLU pack-ups was poked by a tattoo needle and that the plaintiff was issued a conduct report. Dkt. No. 83 at ¶21. On February 26, 2018, an email was sent to security informing them that the plaintiff had received thirty days loss of phone for this major conduct report. Id. at ¶24.

9

On February 22, 2018, the defendant completed Investigative Report No. 2018-5-I and submitted the report to Security Director John Kind, who signed the report on March 4, 2018.[5] Dkt. No. 53 at ¶47. On February 28, 2018, the defendant directed security staff to release the plaintiff from TLU Status. Id. at ¶48. The defendant had no further involvement with this situation as it relates to the plaintiff. Id. at ¶49.

## II. Analysis

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

---

[5] The investigative report is partially redacted. Dkt. No. 61. The portions of the investigative report that pertain to the plaintiff are unredacted and the defendant has provided security justification for redacting the portions of the report that do not pertain to the plaintiff. See Dkt. No. 86 (court's order denying plaintiff's motion for *in camera* review of exhibit 1000 for necessity of redactions).

10

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B. <u>Discussion</u>

The defendant contends that the plaintiff's retaliation claim is based on conjecture and speculation and that no reasonable jury could rule in the plaintiff's favor. Dkt. No. 52 at 11-15. The plaintiff responds that the defendant interrogated him and placed him on TLU in retaliation for the complaint the plaintiff filed against the defendant. Dkt. No. 80 at 3. The plaintiff states that he engaged in protected activity by filing an inmate complaint against the defendant for not responding to his POA document. <u>Id.</u> at 3-4. He states that the direct evidence of the defendant's retaliatory motive is: (1) temporal proximity in that the defendant interrogated him "within days of learning that he had filed a complaint against him and immediately locked him up following his comment about filing complaints when he had a problem[];" (2) the defendant's reaction to the plaintiff's statement about filing complaints by stating, "I'm locking you up;" and (3) moments after ending the interrogation,

11

the defendant leaned in on the plaintiff's left side and told him that he could consider this his denial of the plaintiff's POA. Id. at 4-6. The plaintiff also contends that the three weeks he spent on TLU amounts to a deprivation likely to deter future activity. Id. at 6-8. Finally, he contends that the defendant's claim that he had a legitimate cause to investigate the plaintiff is pretext. Id. at 8-14.

The defendant replies that the timing of the interrogation does not prove retaliation. Dkt. No. 84 at 2-3. He also contends that the plaintiff's unsubstantiated allegation regarding the defendant's remarks is insufficient to meet the burden of causation. Id. at 3-4. The defendant contends that the plaintiff continues to misconstrue the material issue concerning the security investigation and cannot establish causation. Id. at 4-6. He says that the issue is not whether the defendant was correct to suspect the plaintiff's involvement; rather, the issue is whether the defendant genuinely believed that the plaintiff might be involved when he conducted his investigation. Id. The defendant also contends that the retaliatory action was not sufficient to deter a person of ordinary firmness to continue to engage in protected activity. Id. at 5. The defendant contends that no reasonable juror could conclude that after the prison's business office notified the defendant of illicit activity involving trust accounts, and after having received anonymous notes threatening a prison riot related to trust accounts, the subsequent investigation of those anonymous notes was just a pretext to retaliate against the plaintiff for having filed an administrative complaint about his POA paperwork. Id. at 6. Finally, the

12

defendant contends that the plaintiff's arguments disputing the logic of the security investigation fail to prove retaliation. Id. at 7-8.

To establish a *prima facie* case of retaliation in violation of the First Amendment, a plaintiff must show that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." Whitfield v. Spiller, 76 F.4th 698, 707-08 (7th Cir. 2023) (quoting Bridges v. Gilbert, 557 F.3d 541, 546 (7th Cir. 2009)). If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to rebut the claim by showing that the alleged deprivation would have occurred regardless of the protected activity. Manuel v. Nalley, 966 F.3d 678, 680 (7th Cir. 2020) (citing Kidwell v. Eisenhauer, 679 F.3d 957, 964 (7th Cir. 2012)). If the defendant makes that showing, the burden shifts back to the plaintiff to demonstrate that the proffered reason for the deprivation is pretextual or dishonest. Id. (citing Kidwell, 679 F.3d at 969).

It is undisputed that on February 2, 2018, the plaintiff filed an administrative complaint against the defendant alleging that the defendant had not responded to the plaintiff's POA request. This amounts to protected activity for the purpose of the retaliation claim. See Douglas v. Reeves, 964 F.3d 643, 646 (7th Cir. 2020) (grievances against prison officials fall within the First Amendment's protections).

13

Case 2:21-cv-00273-PP   Filed 03/12/25   Page 13 of 20   Document 88

The plaintiff contends that he has satisfied the second element of a retaliation claim because his placement in TLU for three weeks qualifies as a deprivation likely to deter future First Amendment activity. Transfer from one prison to another prison, or from one housing unit to another housing unit, does not amount to a serious deprivation when the conditions remain relatively the same. See Douglas, 964 F.3d at 647; see also Holleman v. Zatecky, 951 F.3d 873, 882 (7th Cir. 2020). But the plaintiff wasn't simply transferred to another unit, he was placed in TLU. The plaintiff says that he initially was placed in a cell for individuals on suicide watch that had plumbing issues, although he did not remain in that cell a full day. The record does not contain information about the conditions on TLU after the first day. The conditions on TLU presumably are not the same as the conditions in general population; the plaintiff describes TLU as located in the restricted housing unit, or segregation. Dkt. No. 80 at 6-7. The court assumes that a three-week transfer to TLU amounts to a serious deprivation. See Young v. Mayer, 669 F. Supp. 3d 719, 734 (E.D. Wis. 2023) (quoting Zach v. Lewis, Case No. 13-CV-849, 2017 WL 280825, at *3 (W.D. Wis. Jan. 20, 2017) ("[S]egregation is not a walk in the park . . . 12 days of segregation and reduced privileges could deter a person of ordinary firmness from filing grievances in the future.")).

Next, the court considers whether the plaintiff has established that his complaint was a motivating factor in the defendant's decision to question him and place him in TLU. Regarding the questioning on February 9, 2018, the plaintiff relies only on temporal proximity in that he says that the defendant

14

questioned him within a few days of February 2, 2018, the date on which the plaintiff filed the complaint against the defendant about the failure to provide the POA. Temporal proximity ordinarily is not sufficient to establish causation, McKinley v. Schoenbeck, 731 F. App'x 511, 514 (7th Cir. 2018) (citing Gracia v. SigmaTron Int'l, Inc., 842 F.3d 1010, 1021 (7th Cir. 2016)); see also Springer v. Durflinger, 518 F.3d 479, 485 (7th Cir. 2008) (temporary proximity alone is insufficient to survive a motion for summary judgment). The plaintiff relies on more than temporal proximity, though, for his argument that his protected activity was a motivating factor. He says that during the interview with the defendant and Kettenhoven, after he told the defendant that he had no problem filing complaints, the defendant reacted by stating that the plaintiff was going to TLU. The plaintiff also states that after the interview, the defendant leaned in and told the plaintiff that he could consider this the defendant's denial of the plaintiff's POA request. The defendant disputes the plaintiff's version of the interview. But construing the facts in the plaintiff's favor (as the court must at summary judgment), the plaintiff's version allows an inference that the plaintiff's complaint was a motivating factor in the defendant's actions.

The plaintiff has established a *prima facie* retaliation claim, so the burden shifts to the defendant to show that the alleged deprivation would have occurred regardless of the plaintiff's protected activity. Zellner v. Herrick, 639 F.3d 371, 378–79 (7th Cir. 2011). In other words, a defendant can rebut the element of causation by showing that the alleged deprivation "would have occurred anyway." Greene v. Doruff, 660 F.3d 975, 980 (7th Cir. 2011). If a

15

defendant makes this showing, the burden shifts back to plaintiff to demonstrate that the proffered reason for the alleged deprivation was pretextual and that the real reason was retaliatory animus. See Zellner, 639 F.3d at 379. "At the summary judgment stage, this means a plaintiff must produce evidence upon which a rational finder of fact could infer that the defendant's proffered reason is a lie." Id.

The record includes ample evidence to establish that the defendant would have interviewed the plaintiff and sent him to TLU even if the plaintiff had not submitted the complaint against the defendant. It is undisputed that on February 9, 2018, Green Bay received two anonymous notes warning of a prison riot and that it was the defendant's responsibility to investigate the situation. The notes, which are partially redacted, say that incarcerated individuals are losing their money and they are going to beat correctional officers. That same day, the defendant received information from the business office that the plaintiff could be a potential suspect for writing the notes because he recently had won a lawsuit against the DOC that resulted in a decrease in the amount of money that could be transferred from incarcerated persons' accounts to cover restitution and because the plaintiff had had large deposits to his account. After the defendant received the plaintiff's name, he called the plaintiff in for questioning. The defendant believed the plaintiff might be involved and he interviewed the plaintiff as part of his investigation. The plaintiff himself says that during the interview, the defendant started out by asking him about the anonymous notes. Based on the interview, the defendant

could not determine that the plaintiff was not involved so he had the plaintiff sent to TLU because of the ongoing investigation. Later that night and early the next morning, staff exchanged emails about the plaintiff's telephone conversations. (The investigation revealed that the plaintiff had been using other incarcerated individuals' PINs to make phone calls, and the plaintiff received a conduct report for this. While he was in TLU, the plaintiff also received a conduct report for having a tattoo needle in his property.) The defendant completed his investigation on February 22, 2018. The plaintiff was released from TLU on February 28, 2018.

The plaintiff contends that he has shown that the defendant's actions were merely a pretext for retaliating against him. Dkt. No. 80 at 8. According to the plaintiff, pretext is shown by the timing of the interrogation, the defendant's reaction to the complaint comment and his verbal denial of the POA. Id. at 9. He also states that the defendant's reason for the interrogation—unauthorized large sums of money being exchanged between incarcerated persons' bank accounts—shows that the investigation was pretextual, as does the defendant's reason for the TLU placement (to freeze the situation to prevent any further unauthorized transfers of money). Id. at 9-12. The plaintiff also contends that the investigation into the anonymous notes makes no sense; he argues that there is no logical connection between the notes and collection of restitution because the policy that had been in effect since July 2016 increased the rate of collection for all obligations, not just restitution, and the fact that

the plaintiff successfully challenged the policy does not make it likely he wrote the notes. Id. at 12-14.

The plaintiff's disagreement with the defendant's investigation does not prove that the investigation was a sham. Regardless of the plaintiff's belief that it did not make sense that he was the subject of an investigation, the fact remains that anonymous notes threatening a prison riot related to incarcerated individuals' money were received at Green Bay on February 9, 2018, and the defendant was tasked with investigating the notes. As part of his investigation, the defendant received information from the business office that the plaintiff could be a potential suspect for writing the notes because he recently had won a lawsuit against the DOC that decreased the amount of money that could be transferred from accounts to cover restitution and because the plaintiff had had large deposits to his account. The defendant's interview of the plaintiff was short, and the plaintiff says that while the defendant asked him about the anonymous notes, the plaintiff did not have any information to give the defendant because the plaintiff was not involved. The defendant had the plaintiff sent to TLU. The plaintiff has not established that the defendant's stated reason for sending him to TLU—the ongoing investigation—was a lie. The investigation continued once the plaintiff arrived in TLU. The defendant completed his investigation report on February 22, and the plaintiff was transferred from TLU six days later, on February 28, 2018.

18

A reasonable factfinder could not infer that the defendant's investigation was pretextual. The court will grant the defendant's motion for summary judgment and dismiss the case.

## III. Conclusion

The court **GRANTS** the defendant's motion for summary judgment. Dkt. No. 51.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. Rule of App. P. 4(a)(5)(A).). If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion *in this court.* See Fed. R. App. P. 24(a)(1). The plaintiff may be assessed a "strike" by the Court of Appeals if it concludes that his appeal has no merit. If the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas corpus* relief) without prepaying the full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. Id.

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 12th day of March, 2025.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**